## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ROXANNE RUIZ-MORALES,

      **Plaintiff,**

      v.

AMERICAN AIRLINES, INC.,

      **Defendant.**

**Civil No. 16-2837 (ADC)**

## OPINION AND ORDER

Before the Court is a motion for summary judgment filed by defendant American Airlines, Inc. ("defendant" or "American Airlines"), **ECF No. 27**, along with defendant's statement of uncontested material facts (generally, "SUMF"), **ECF No. 28**, and supporting exhibits, **ECF Nos. 29, 32**. Roxanne Ruiz-Morales ("plaintiff") filed a motion to strike the majority of the facts enumerated in defendant's SUMF, **ECF No. 35**, which she replaced with an amended motion to strike, **ECF No. 38**. In addition, plaintiff filed a cross-motion for partial summary judgment in conjunction with her opposition to defendant's motion for summary judgment, **ECF No. 36**, and a separate SUMF and supporting documents. **ECF No. 37**. Defendant filed a combined response in opposition to plaintiff's motion to strike and cross-motion for partial summary judgment, **ECF No. 40**, and a separate opposition to plaintiff's SUMF, **ECF No. 43**. Upon leave of the Court, defendant also filed a surreply in support of its motion for summary judgment. **ECF Nos. 41, 42**. For the reasons explained below, defendant's motion for summary

judgment is **GRANTED IN PART** and **DENIED IN PART**. **ECF No. 27**. Plaintiff's amended

motion to strike and plaintiff's cross-motion for partial summary judgment are **DENIED**. **ECF**

**Nos. 36, 38**. Within fifteen days of the date of this order, the parties are to provide the Court

with dates they are available for a settlement conference and proposed trial dates.

## I.     Background

This case is before the Court upon defendant's removal from the Puerto Rico Court of

First Instance, San Juan Part.[1] American Airlines terminated plaintiff's employment as their

Premium Services Manager at the Luis Muñoz Marin International Airport ("SJU"), effective

December 31, 2015. Plaintiff alleges she is due severance pay (also referred to as "mesada") for

her wrongful termination, pursuant to Puerto Rico Laws Ann. tit. 29, § 185b ("Law 80"). Plaintiff

challenges defendant's just cause for her termination, noting that she was the sole employee

terminated as a result of defendant's purported reorganization and partial closing of its

operations in SJU. She also claims that, irrespective of just cause, American Airlines did not

comport with Law 80's requirement that it dismiss the least senior employees within her job

classification. She identifies three comparably-employed individuals with less seniority, all of

whom retained their positions as Customer Service Managers after plaintiff's termination.

Defendant asserts plaintiff's layoff was a result of its corporate reorganization and

decision to partially close its operations at SJU, specifically its decision to shutter its "Admirals

Club," over which plaintiff was the Premium Services Manager. Additionally, defendant

---

[1] A certified English translation of the underlying complaint is available at **ECF No. 1-1** at pages 10–13.

contends that the Customer Services Manager positions identified by plaintiff were not sufficiently comparable to her role as Premium Services Manager to trigger Law 80's seniority requirement.

Thus, the questions before the Court boil down to whether American Airlines had just cause to terminate plaintiff and, if so, whether plaintiff's position as Premium Services Manager was sufficiently comparable to the Customer Services Manager positions identified to warrant severance pay under Law 80 for failure to comply with the law's seniority preferences. The undisputed facts are as follows:[2]

1. Defendant is a corporation that operates a passenger and cargo airline. **ECF Nos. 37** at 2; **43** at 2.

2. Plaintiff worked for defendant for thirty-two years, from June 16, 1983, until she was laid off effective December 31, 2015. **ECF Nos. 28** at 1; **37** at 2, 16; **43** at 2.

3. Plaintiff started at American Airlines as a part-time ticket sales agent. She progressed to a sales representative, account manager, and then Premium Services Manager ("PSM"). She never held the position of "Customer Services Manager" ("CSM"), though she covered the CSM position when there was no CSM on duty. **ECF Nos. 28** at 1; **37** at 16; **43** at 13. While employed by defendant, plaintiff worked exclusively within Puerto Rico. **ECF Nos. 28** at 2; **37** at 16.

---

[2] The following facts constitute a distillation of the parties' SUMFs and responses to each other's SUMFs. **ECF Nos. 28, 37, 43.**

4.  Plaintiff held the position of PSM for American Airlines at SJU at the time of her layoff. *Id*.

5.  She held this position for approximately twelve or thirteen years. *Id*. She was appointed PSM in 1999. **ECF Nos. 37** at 2, **43** at 2.

6.  Plaintiff's responsibilities as PSM included operating the Admirals Club at SJU. **ECF Nos. 28** at 2; **37** at 16. She oversaw the preparation of food and drink budgets for the Admirals Club; negotiated contracts with food, drink, and other vendors; and provided customer services, such as ticketing and rerouting services directly to Premium customers.[3] *Id*. She maintained a budget, worked to meet profitability and cost-control goals, ensured compliance with all operations (including passenger issues inside and outside the Admirals Club), investigated discrepancies, compiled statistics, and provided data for reports (pertaining to, e.g., passengers that arrived late at the gate). **ECF Nos. 37** at 7–8; **43** at 7.

7.  Her responsibilities also involved "assuring that quality service was provided [to] customers in order to achieve superior client satisfaction. This entailed resolving" problems, interacting with clients and employees, and attending debriefing meetings with the General Manager, José Rucabado (the "General Manager:"). **ECF No. 37** at 7; **43** at 7. Her tasks as PSM occurred inside the Admirals Club and at the gates outside the

---

[3] Plaintiff disputes the priorities of her responsibilities as a PSM, elevating the managerial and the customer service duties above her administrative duties in running the Admirals Club. **ECF No. 37** at 17.

club. The work she performed outside the Admirals Club included assisting VIP customers with boarding, ensuring VIP customers on a standby list were taken care of at the gate, interacting with gate agents, and attending manager meetings and debriefings. **ECF Nos. 37** at 8; **43** at 7.

8.  As PSM in charge of the Admirals Club, plaintiff supervised, coached, counseled, and tracked performance of employees with the title, "Premium Service Agent" ("PS Agents"). **ECF Nos. 28** at 2; **37** at 6–7, 16–17; **43** at 2, 6. The main duties of the PS Agents were to register, sell, or reissue tickets, provide services, and reroute the luggage of customers at the Admirals Club. **ECF Nos. 28** at 2; **37** at 17.

9.  A formal job description for the CSM position was in effect at the time of plaintiff's termination and included the position's essential tasks and responsibilities. **ECF Nos. 37** at 3; **43** at 3.

10. CSMs, such as Ilsa Martínez, Sally Pérez, and Felipe Otero, were front line supervisors managing employees with direct customer contact. **ECF Nos. 37** at 8; **43** at 7. They carried out tasks "above" and "below the wing." **ECF Nos. 28** at 6; **37** at 12, 22; **43** at 10, 16–17.

11. The phrase "below the wing" refers to the "ramp" area. The area "above the wing" consists of the airport's terminals and gates. **ECF Nos. 28** at 3; **37** at 19.

12. Part of the responsibilities for CSMs below the wing involved supervising ramp operations conducted by Fleet Service Clerks, whose primary responsibility is to load and

unload luggage and cargo to and from the aircraft. Fleet Service Clerks do not sell tickets, issue refunds, reissue tickets, or change itineraries. **ECF Nos. 28** at 7; **37** at 22–23.

13. CSMs above the wing supervise Customer Service Agents[4] ("CS Agents") with issuing and reissuing tickets, changing itineraries, issuing refunds, and boarding the planes. **ECF Nos. 28** at 4, 7; **37** at 19, 23; **43** at 14–15.

14. Plaintiff had some experience interacting with CSMs and CS Agents in the terminal and gate areas while dealing with passenger ticketing and luggage issues.[5] **ECF No. 28** at 3; **37** at 17–18.

15. Sometimes CS Agents worked in the Admirals Club. **ECF Nos. 37** at 13; **43** at 12.

16. Both the CSM and PSM positions involve supervising and managing employees, assuring safety, and providing customer service. **ECF Nos. 37** at 3, 9; **43** at 4, 9. The PSM and CSMs used the same internal protocols to track and document employees' performance. **ECF Nos. 37** at 7; **43** at 7.

17. Plaintiff took many of the same trainings as the CSMs, including a ramp services training. **ECF Nos. 37** at 13; **43** at 11.

18. Former Admirals Club Manager, Tere Méndez, described the responsibilities of PSMs and CSMs as eighty-five to ninety percent the same. She last worked with American Airlines in 2008. **ECF Nos. 37** at 9; **43** at 8.

---

[4] The parties interchangeably refer to "Customer Service Agents" as "Passenger Service Agents." *See, e.g.*, **ECF No. 37** at 19. For simplicity, the Court will employ the terms "Customer Service Agent" or "CS Agent."
[5] The parties dispute the frequency of these interactions. **ECF Nos. 28** at 3, **37** at 17–18.

19. Minnette Vélez, American Airlines' Communications Manager for Central America and Puerto Rico, described the PSM and CSM positions as involving the same work, though Vélez has been to SJU only about ten times since 2010. **ECF Nos. 37** at 9; **43** at 8.

20. When there was no CSM on duty, plaintiff would cover the responsibilities of that position, but it did not happen often. **ECF Nos. 37** at 14; **43** at 12.

21. CSMs had five primary responsibilities, to: (1) provide quality service and achieve superior customer satisfaction; (2) meet profitability and cost-control goals; (3) ensure compliance with all operations, safety, and federal guidelines; (4) provide team members with fair and equitable treatment; and (5) run an effective operation. Plaintiff carried out all of these responsibilities and associated tasks as PSM. **ECF Nos. 37** at 9–10; **43** at 9–10.

22. The position of CSM had twelve job requirements, all of which plaintiff satisfied as PSM. These were, an ability to: (1) lead and motivate employees in working as a team; (2) be decisive and work under demanding operational conditions and stressful environments; (3) "meet public contact profile"; (4) have excellent oral and written communication, leadership, initiative, and judgment skills; (5) demonstrate strong administrative skills and analytical abilities; (6) "require" rotation of shifts, days off, and holidays; (7) draw on prior airport experience; (8) maintain knowledge of company policies and procedures; (9) fulfill criminal background checks and qualify for unescorted privileges to airport security identification display areas; (10) secure appropriate airport and/or U.S. Customs security badges; (11) pass U.S. Department of Transportation's mandated drug-testing

requirements; and (12) become a certified Ground Security Coordinator, if applicable. **ECF Nos. 37** at 14; **43** at 12.

23. On October 13, 2015, defendant informed plaintiff that a reorganization would be carried out as a result of which the position of PSM would be eliminated. **ECF Nos. 37** at 3; **43** at 2. At the time of her termination, plaintiff was not offered another position in the Passenger Service Department. *Id*.

24. At some point, the PS Agents supervised by plaintiff were offered part-time positions as CS Agents in San Juan. **ECF Nos. 37** at 16–17; **43** at 13. The PS Agents that plaintiff supervised were reclassified as CS Agents prior to plaintiff's termination in 2015. They did not have any responsibility for loading or unloading luggage. **ECF Nos. 28** at 7; **37** at 22–24; **43** at 13.

25. Aerostar Airport Holdings ("Aerostar") became the operator of SJU,[6] at which time SJU underwent major renovations. **ECF Nos. 28** at 4; **37** at 19.

26. Between 2012 to December 2015, the number of flights for American Airlines in and out of SJU decreased substantially. **ECF Nos. 28** at 4; **37** at 19.

27. Prior to December 31, 2015, the Admirals Club at SJU was located in Terminal D. For many years, defendant operated its flights out of Terminal D. **ECF Nos. 28** at 4–5; **37** at 19–20.

---

[6] Plaintiff disputes the year that this happened. **ECF No. 37** at 19. Defendant asserts it was sometime in 2013. **ECF No. 28** at 4.

28. As part of the renovations at SJU, defendant's flight operations changed to Terminal C. **ECF Nos. 28** at 4; **37** at 19. The Admirals Club remained in Terminal D. Thus, as a result of the change from Terminal D to Terminal C, the Admirals Club was no longer located in the terminal hosting defendant's flights. **ECF Nos. 28** at 5; **37** at 20.

29. Defendant's Senior Regional Manager in the Premium Service Department, Patsy Yuen-lyn ("Yuen-lyn"), executed a sworn statement attesting that Aerostar was not willing to fully pay for the rebuild of the Admirals Club in Terminal C to the specifications required by American Airlines. She attested defendant would have to pay a large portion of the construction costs and defendant did not have the budget to do so.[7] **ECF Nos. 28** at 5; **37** at 20. Yuen-lyn attested that this was the reason defendant closed the Admirals Club in the fall of 2015, thereby eliminating the Premium Services Department in San Juan. *Id*.

30. The Admirals Club was part of the operations of American Airlines in San Juan. **ECF Nos. 28** at 5; **37** at 20.

31. American eliminated the Premium Services Department. **ECF Nos. 28** at 5; **37** at 21.

32. Defendant has not reopened the Admirals Club in SJU through today, more than three years after plaintiff's termination. *Id*.

33. Defendant possessed a document entitled "Position Detail" that identified, among other things, the classification of each individual employee, position title, employee group,

---

[7] Plaintiff disputes the credibility of Yuen-lyn's sworn statement, specifically challenging her personal knowledge of the situation. **ECF No. 37** at 20. *See infra* § III(B)(1).

employee subgroup, basis of pay, name of the supervisory unit, compensation plan category, and compensation level.[8] **ECF Nos. 37** at 4; **43** at 4–5.

34. Plaintiff claims that there were three American Airlines employees less senior than her that were part of the same workgroup, "Personnel Subarea," with the same classification, "0004 Mgt Ops," and the same compensation level of "03"—Sally Pérez, Ilsa Martínez, and Felipe Otero. Felipe Otero started working at American Airlines on February 26, 2015, approximately ten months prior to plaintiff's termination. They shared the same pay scale as Front Line Supervisors, who are supervisors with direct customer contact. **ECF Nos. 28** at 6; **37** at 4–5, 21; **43** at 5–6.

35. The Position Details for Sally Pérez lists her Organization Name as SJU Ramp/ Ground/ Passenger/ Ground Equipment Maintenance. Ilsa Martínez and Felipe Otero reported to the Airport Operation. The Position Details for plaintiff lists her organization name as Premium Services SJU. **ECF Nos. 37** at 5; **43** at 6.

36. At the time plaintiff was laid off in December 2015, there were four individuals who held the title of CSM for defendant in San Juan: Vanessa Sacarello, Sally Pérez, Ilsa Martínez, and Felipe Otero. Ilsa Martínez retired from American Airlines on June 1, 2016, 152 days after plaintiff's termination but less than six months after plaintiff's termination. Defendant did not offer the CSM position held by Ilsa Martínez to plaintiff. By that time,

---

[8] Defendant disputes the relevance of this document. **ECF No. 43** at 4–5.

plaintiff's counsel had already communicated with defendant regarding plaintiff's Law 80 rights. **ECF Nos. 28** at 6; **37** at 21–22; **43** at 16.

37. Vanessa Sacarello was more senior to plaintiff. **ECF Nos. 28** at 8; **37** at 24.

38. Pérez, Martínez, and Otero, who had less seniority than plaintiff, worked in a different department from plaintiff. Plaintiff worked in the Premium Services Department. She reported directly to Yuen-lyn. **ECF Nos. 28** at 6; **37** at 22. She indirectly reported to the General Manager. **ECF Nos. 37** at 15; **43** at 12.

39. CSMs were managed by the General Manager and their performance was evaluated by Mildred Fuentes-Viera. **ECF Nos. 37** at 15; **43** at 12.

## II.   Legal Standards

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. United States Dept. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). Facts not properly controverted in accordance with Local Civil Rule 56 "shall be deemed admitted." *Puerto Rico Am. Ins. Co. v. Rivera-Vázquez*, 603 F.3d 125, 130–31 (1st Cir. 2010). All reasonable inferences are drawn in favor of the non-moving party. *Collazo-Rosado v. University of P.R.*, 765 F.3d 86, 92 (1st Cir. 2014). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—

that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

"[T]o survive summary judgment a plaintiff is not required to rely only on uncontradicted evidence." *Calero-Cerezo*, 355 F.3d at 19 (emphasis omitted). When "the record as a whole presents many inconsistencies, displaying perspectives that favor in some lights the defendants and in others the plaintiff," and "plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." *Id.*

In addition, "[i]t is a black-letter rule that state substantive law supplies the rules of decision for a federal court sitting in diversity jurisdiction." *Lexington Ins. Co. v. General Accident Ins. Co. of Am.*, 338 F.3d 42, 46 (1st Cir. 2003). Plaintiff brings her claims under Puerto Rico Law 80. "Law 80 creates a right of action for at-will employees fired 'without just cause.'" *Villeneuve v. Avon Prod., Inc.*, 919 F.3d 40, 46 (1st Cir. 2019) (citing P.R. Laws Ann. tit. 29, § 185a). The "just cause" standard aims to protect an employee from dismissal based "on a whim of the employer." P.R. Laws Ann. tit. 29, § 185b. The employer must nonetheless "'give preference to [retaining] those employees with greater seniority over those with less seniority within the same occupational classification.'" *Villeneuve*, 919 F.3d at 46 (quoting *Carrasquillo-Ortiz v. American Airlines, Inc.*, 812 F.3d 195, 196 (1st Cir. 2016)).

## III.   Analysis

### A.   Motion to Strike

Plaintiff's motion to strike and, to an extent, her cross-motion for partial summary judgment, are premised on defendant's alleged failure to satisfy the heightened pleading standard imposed on employers by Law 80. **ECF Nos. 36** at 1+2; **38-1** at 1. Plaintiff moves to strike the majority of the facts alleged in defendant's SUMF on the basis that defendant did not plead those facts in its answer to the complaint. **ECF No. 38-1** at 1. And, "[b]y failing to do so," plaintiff asserts defendant "waived its right to justify the employment termination with any facts that were not alleged in the Answer to the Complaint." **ECF No. 38-1** at 6. The facts that plaintiff identifies as omitted from the complaint constitute paragraphs six through thirty-nine of the SUMF. Once those paragraphs, and all of defendant's arguments derived therefrom, are stricken, plaintiff argues, the undisputed material facts necessarily fall in her favor. **ECF No. 36** at 1–2.

Defendant asserts that plaintiff's argument is premised on an inapplicable pleading standard and otherwise amounts to an untimely challenge of the defensive pleadings pursuant to Federal Rule of Civil Procedure 12(f). **ECF No. 40** at 3.

Law 80, as it appeared at the time of plaintiff's termination, required an employer "'to plead in his answer to the complaint the facts that led to the dismissal, and to prove that it was justified in order to be exempted from compliance with . . . this title.'" *Cardalda-Sánchez v. Universidad Carlos Albizu*, 2009 WL 4015652 at *1 (D.P.R. Nov. 12, 2009) (omission in original) (quoting P.R. Laws Ann. tit. 29, § 185k(a) (2006)). *See* **ECF No. 36** at 6, n. 1. "The Supreme Court of Puerto Rico has interpreted § 185k as establishing that the assertion of just cause for

termination is an affirmative defense," and, therefore, may be waived if improperly pleaded. *Id.* (citing *Secretario del Trabajo v. J.C. Penney Co.*, 119 D.P.R. 660, 19 P.R. Offic. Trans. 702, 711 (1987)).

However, "state pleading requirements, so far as they are concerned with the degree of detail to be alleged, are irrelevant in federal court even as to claims arising under state law." *Andresen v. Diorio*, 349 F.3d 8, 17 (1st Cir. 2003). The Federal Rules of Civil Procedure apply in Federal Courts sitting in diversity jurisdiction "as long as [the] Rule is consonant with both the Constitution and the Rules Enabling Act, 28 U.S.C. § 2702, . . . 'regardless of contrary state law.'" *Morel v. DaimlerChrysler AG*, 565 F.3d 20, 24 (1st Cir. 2009) (quoting *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 n.7 (1996)). Because the Rules Enabling Act prohibits rules of practice, evidence, and procedure in the federal courts that "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a rule that "relates directly to the practice and procedure of the district court" by, e.g., "govern[ing] the in-court dispute resolution processes rather than the dispute that brought the parties into court," does not violate the Act, *Morel*, 565 F.3d at 24 (citation and internal quotation marks omitted). Rules 8 and 9 of the Federal Rules of Civil Procedure, governing pleading standards and restricting heightened pleading requirements to claims of fraud or mistake, are "quintessentially procedural," and therefore applicable in this case despite Law 80's language. *See Morel*, 565 F.3d at 25.

Plaintiff's amended motion to strike is accordingly **DENIED**.[9] **ECF No. 38**. Plaintiff's arguments in her cross-motion for partial summary judgment premised on this pleading-standard argument necessarily fail. **ECF No. 36**.

### B.      Summary Judgment

Plaintiff disputes defendant's just cause for her termination. Plaintiff also argues that she should have been reassigned as a CSM and a more junior CSM terminated in her stead.  **ECF No. 36** at 2.

Under Law 80, a dismissal is for just cause when, for example, the employer undergoes a "[f]ull, temporary, or partial closing of [its] operations," even where "the employer has more than one office"; "[t]echnological or reorganization changes . . . and changes in the services rendered to the public"; "[d]ownsizing made necessary by a reduction in the foreseen or prevailing volume of . . . sales[] or profits at the time of discharge." P.R. Laws Ann. tit. 29, § 185b(d)–(f). And, "if the employer fires 'employees for one of those . . . reasons, . . . the employer must give preference to those employees with greater seniority over those with lesser seniority within the same occupational classification.'" *Villeneuve*, 919 F.3d at 46 (citation and internal quotation marks omitted). Because Law 80 "is aimed at compensating workers, [it] must

---

[9] Plaintiff also claims she is prejudiced by defendant's pleading deficiencies, having been blindsided at the eleventh hour by defendant's newly disclosed details of its theory of the case. Based on the applicable pleading standards under the Federal Rules of Civil Procedure Rule 8, plaintiff's claim of prejudice is baseless. Defendant identified its just cause arguments in its answer to the complaint. **ECF No. 20** at 6. Defendant notes that it has been forthright with its affirmative defenses and theories of the case since at least July 2017. **ECF No. 40** at 3. The Court does not address defendant's additional arguments challenging the timeliness of plaintiff's motions because the Court concludes that neither motion is successful on the merits. *See* **ECF No. 40** at 1.

always be interpreted in a liberal and favorable manner for the employee." *Pi-Colón v. Sucesión J. Serralles Second, Inc.*, 2017 P.R. App. Lexis 1505, at *26 (T.C.A. 2017) (certified translation at **ECF No. 32-2**).

    **1.    Just Cause**

Defendant attributes its decision to terminate plaintiff's employment on Aerostar's remodel of SJU, which relocated defendant's flights to Terminal C but retained the Admirals Club in Terminal D. Defendant asserts that the cost it would have incurred to rebuild the Admirals Club in Terminal C was not in its budget, also noting that the number of flights it has operated through SJU has been decreasing over the last few years. Rather than have an Admirals Club in a separate terminal than its flights, defendant opted to cease its Premium Services in SJU and close the Admirals Club. **ECF No. 27** at 4–5.

Plaintiff's argument hinges on defendant's failure to provide financial documents substantiating these business decisions. **ECF No. 36** at 10–11. She does not dispute the core facts alleged by defendant. Plaintiff agrees that the Premium Service Department and Admirals Club were closed by American Airlines and that defendant told her she was being terminated in light of this alleged corporate restructuring. **ECF No. 29-1** at 50–51. She agrees that the Admirals Club has not since been reopened. **ECF Nos. 28** at 5; **37** at 21. She agrees that the Admirals Club should be located in the same terminal as the airline's flights. **ECF No. 29-1** at 50. Lastly, plaintiff agrees that defendant had substantially reduced the number of flights it operated through SJU between 2012 and December 2015. **ECF Nos. 28** at 4; **37** at 19. But, without documentation evidencing

defendant's financial data and the cost of relocating the Admirals Club, plaintiff asserts, there is no "concrete proof" that the decision to close the Club, eliminate the Premium Services Department, and subsequently terminate her employment "was not arbitrary or capricious." **ECF No. 36** at 11.

Plaintiff's interpretation of Law 80's standard of proof for employers is untenable. The First Circuit Court of Appeals has held that Law 80 and Puerto Rico precedent is "sufficiently clear that to show just cause an employer need only demonstrate that it had a reasonable basis to believe" that the case fits within one of the enumerated scenarios in Law 80. *See Pérez v. Horizon Lines, Inc.*, 804 F.3d 1, 9 (1st Cir. 2015). The Court of Appeals explained, "To our minds, Law 80's language forbidding an employer [from] act[ing] on a whim suggests that a just discharge is one where an employer provides a considered, non-arbitrary reason for an employee's termination that bears some relationship to the [company's] operation." *Villeneuve*, 919 F.3d at 48 (alterations in original) (citation and internal quotation marks omitted). Likewise, "[w]hen considering Law 80 claims," the Puerto Rico Supreme Court "consistently asks whether an employer's termination decision was 'whimsical or abusive' or whether the employer has acted 'abruptly or capriciously.'" *Pérez*, 804 F.3d at 9 (citing *Narvaez v. Chase Manhattan Bank, N.A.*, 120 D.P.R. 731, 20 P.R. Offic. Trans. 766, 773 (1988); *Báez García v. Cooper Labs, Inc.*, 120 D.P.R. 145, 20 P.R. Offic. Trans. 153, 162 (1987)). The Puerto Rico Supreme Court has "resisted reading Law 80 to impose statutory penalties 'just because an employer makes an error of judgment,' since such a rigid reading (which would seem to require courts to regularly review

the merits of companies' internal investigations) would go 'beyond the letter and spirit of the law.'" *Id*. at 9–10 (quoting *Narvaez*, 20 P.R. Offic. Trans. at 773). Thus, "while Law 80 undoubtedly circumscribes the reason for which an employer may terminate an employee[,] . . . [courts] do not read the statute to require a factfinder to regularly review the objective accuracy of an employer's conclusions." *Villeneuve*, 919 F.3d at 48 (citation and internal quotation marks omitted) (alteration and omission in original).

Plaintiff's argument that defendant needed to provide specific financial data substantiating its business decisions is not supported by the law. Surely such documents would aid a factfinder in its determination of just cause, but the provision of such is not an inherent requirement of Law 80. *See Santiago-Colón v. Kraft Foods Puerto Rico*, 2011 P.R. App. Lexis 2872, at *32 (T.C.A. 2011) (certified translation at **ECF No. 32-1**) (noting that an employer's decision to implement technological or reorganization changes "does not have to necessarily be contained in a formal plan prepared, ordinarily, by experts in the human resources administration or operational area of a company"). Plaintiff's argument is accordingly denied.

However, plaintiff also disputes the credibility of Yuen-lyn's statements substantiating just cause. **ECF Nos. 28** at 5; **37** at 20. Though plaintiff agrees with the core factual assertions underlying defendant's justification for her termination she disagrees that they necessarily amount to "just cause" under Law 80. In other words, plaintiff essentially disputes the causal link connecting the company's circumstances and her termination. Yuen-lyn attested to causation in a sworn declaration, explaining that because American Airlines lacked the budget

to rebuild the Admirals Club in Terminal C, the airline decided sometime in the fall of 2015 to close the Club in SJU, eliminate the Premium Services Department in SJU, and subsequently lay off its Premium Services Manager, plaintiff. **ECF Nos. 28** at 5; **28-1**; **37** at 20–21. Nonetheless, plaintiff disputes Yuen-lyn's personal knowledge of the reasons for her termination, noting that Yuen-lyn did not "establish[] that she was in any way involved in the decision to close the Admiral's Club in San Juan," "that she had any personal involvement in the closing of the Club" or, that the decision to close the Club occurred within the fall of 2015 or some other timeframe relevant to her termination. **ECF No. 37** at 20. Regardless of Yuen-lyn's credibility, the material facts supporting defendant's justification for terminating plaintiff remain undisputed. And the unifying thread sewn through these uncontested facts is fairly obvious—upon Aerostar's remodeling at SJU, defendant opted to undergo an operational restructuring at SJU and eliminate its Admirals Club and Premium Services Department in SJU. In doing so, defendant asserts, it eliminated plaintiff's position as PSM and terminated her.

Whether this decision has proven to be a wise financial move for defendant is beside the point under Law 80. A court "must perform an analysis of the manner in which a company renders services or carries out its operations and whether decisions to make modifications are a legitimate exercise of its directive power as a company." *Santiago-Colón*, 2011 P.R. App. Lexis 2872 at *32. A court cannot impose on a private employer the task of "prepar[ing] formal or expert studies to implement operational, technological, organizational or personnel reduction changes." *Id.* at *33. Thus, defendant's asserted rationale withstands the Puerto Rico Supreme

Court's test as to whether the defendant's decision "was 'whimsical or abusive' or whether [defendant] has acted 'abruptly or capriciously.'" *See Pérez*, 804 F.3d at 9 (citation omitted). Accordingly, plaintiff's request for summary judgment as to the just cause for her termination is **DENIED**. **ECF No. 36**. Defendant's request for summary judgment on the just cause determination is **GRANTED**. **ECF No. 27**.

### 2.      Priority Retention Based on Seniority

Plaintiff argues that defendant also failed to abide by Law 80's requirement that it prioritize retention in employment based on the employee's seniority. Defendant contends that the seniority preference in the statute does not apply because it did not have any comparable positions to offer plaintiff.

"Priority retention based on seniority has to be carried out within the same occupational classification, as long as there are available vacant positions or positions held by employees who have less seniority that they are able to perform, not between different occupational classifications." *Santiago-Colón*, 2011 P.R. App. Lexis 2872 at *19–20.[10] Law 80 "does not permit bumping employees between different occupational classifications," rather, "seniority is

---

[10] An "'occupational classification,' . . . is defined as a 'set of jobs that entail significantly similar tasks,' and constitutes the first step of grouping together work activities." *Santiago-Colón*, 2011 P.R. App. Lexis 2872, at *45 n.26.

> [T]he "occupational classification" is the key concept for the purposes of establishing the skills or qualifications required to hold a position. In this context, a work position has been defined as the "defined set of tasks, duties and responsibilities that, in the framework of certain work conditions, constitutes the current work of an individual." . . . For example, in the workforce of a company there can be 20 "administrative accounting officers" (occupational classification or level), of which 15 perform cost control tasks (work positions) and 5 perform fiscal and financial analysis and registration tasks (work positions).

*Id*. at *45–46 n.26.

considered within each appropriate bargaining unit." *Id*. at *20. There are four factors a court must consider in resolving disputes regarding an employee's occupational classification: "(1) the functions and duties of the position; (2) the requirements for the position, which includes the knowledge and skills required and educational background; (3) the form of compensation; and (4) the manner in which the works is performed." *Id*. at *20–21. Law 80 "does not require the duties performed by employees in the same occupational classification to be identical, but that they be able to perform them." *Id*. at 49. And, "it is not the title that a company gives a position or the compensation assigned to the position that matters." *Id*. Rather, "the important thing is to determine the similarities between the duties and requirements of a position in order to group together into one same classification positions that share common characteristics." *Id*. Courts, however, should be mindful that "[t]he function of establishing occupational classifications in a company and determining which classification an employee works in is a managerial prerogative that ordinarily warrants great deference on the part of the courts." *Id*. at *21 (citation and internal quotation marks omitted).

The parties both walk through this four-part analysis, focusing on different aspects of the PSM and CSM positions to sustain their diverging argument. As defendant succinctly summarized in its surreply in support of its motion for summary judgment:

> [Plaintiff] fails to rebut the dispositive facts regarding the three Customer Service Managers she uses as comparators: that a significant part of their responsibilities involved managing operations she never managed and supervising a group of employees (Fleet Service Clerks) she did not supervise. Instead, she argues that her core responsibilities were to supervise employees and to ensure good

customer service. She lists a litany of duties she performed while supervising employees in the Admirals Club, including ensuring compliance with policies and evaluating their performance. She also argues that she sometimes supervised [Customer] Service Agents in the terminal and gate areas.

**ECF No. 42** at 2. Indeed, the parties do not disagree as to the functions, duties, requisite background, compensation, and manner of work for the CSM and PSM positions. *See supra* § II. And they each present testimonial evidence favoring their descriptions. *See* **ECF Nos. 28** at 5; **37** at 9; **43** at 4. However, they prioritize different aspects of each position to favor their arguments. Defendant focuses on the undisputed fact that plaintiff's "responsibilities did not include supervising the Ramp operations and the Fleet Service Clerks, a significant responsibility of her three comparators." **ECF No. 42** at 2. Plaintiff focuses on the overlapping supervisory and customer service aspects of the PSM and CSM positions, as well as the positions' analogous training and background requirements and American Airline's comparable personnel classifications of the positions. **ECF No. 36** at 3–5.

The Court finds that both interpretations of the CSM and PSM job description are supported by the evidence and plausible. In other words, there exists a dispute of material facts essential to the outcome of plaintiff's Law 80 claim, precluding entry of summary judgment for either party. Defendant's motion for summary judgment is therefore **DENIED** with respect to its seniority argument. **ECF No. 27**. Plaintiff's cross-motion for partial summary judgment is **DENIED**. **ECF No. 36**.

IV.     **Conclusion**

Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. **ECF No. 27**. Plaintiff's amended motion to strike and plaintiff's cross-motion for partial summary judgment are **DENIED**. **ECF Nos. 36, 38**. Within fifteen days of the date of this order, the parties are to provide the Court with dates they are available for a settlement conference and proposed trial dates.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 10th day of September, 2019.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**